# IN THE SUPREME COURT OF TEXAS

═══════════

No. 12-1006

═══════════

CITY OF HOUSTON, PETITIONER,

v.

SHAYN A. PROLER, RESPONDENT

══════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

══════════════════════════════════

**Argued February 6, 2014**

JUSTICE WILLETT delivered the opinion of the Court.

JUSTICE BROWN did not participate in the decision.

Does a firefighter who refuses to fight fires have a "disability" under either state or federal law? We answer no and therefore reverse the court of appeals' judgment in part.

## A. Background

Shayn Proler was a firefighter with the Houston fire department. He rose to the level of captain, leading a fire suppression crew. Proler testified that, in 2004, a fellow firefighter complained that Proler would not enter a burning apartment building. Proler disputed this accusation. He was reassigned to the firefighter training academy. He objected to the reassignment and was eventually transferred back to a fire suppression crew, conditioned on periodic evaluations.

In March 2006, Proler arrived at a house fire and was unable to put on his firefighting gear. He was unable to take orders and had difficulty walking. Someone escorted him to a house next door and sat him down on a bucket. He went to a hospital and was diagnosed with "global transient amnesia." Another captain on the scene reported that Proler did not appear to be aware of his surroundings and that he was either frightened or in the throes of an acute medical emergency. A letter from another officer to the assistant chief requested an investigation of Proler to address "this possibly dangerous situation." Shortly thereafter, an assistant chief again assigned Proler to the training academy. The City requested a follow-up medical evaluation from one of Proler's doctors, Dr. Ferrendelli, who noted an episode of global transient amnesia but approved Proler's return to work.

Under the terms of a collective bargaining agreement, Proler filed an administrative grievance seeking reassignment to a fire suppression unit. On administrative appeal, a hearing examiner sided with Proler, who was reassigned to fire suppression. The City appealed this decision to the trial court, alleging jurisdiction under the Declaratory Judgments Act[1] and chapter 143 of the Local Government Code. Proler counterclaimed for disability discrimination under federal and state law.

The trial court granted Proler's plea to the jurisdiction, concluding that it lacked jurisdiction over the City's administrative appeal. The disability claim proceeded to trial. The jury found that the City had discriminated against Proler in reassigning him to the training academy after the March 2006 incident but awarded no damages. The trial court rendered a judgment in favor of Proler that

---

[1] TEX. CIV. PRAC. & REM. CODE § 37.001 *et seq.*

enjoined the City from further acts of discrimination and awarded Proler attorney fees of approximately $362,000, together with costs.

The court of appeals reversed the order granting Proler's plea to the jurisdiction insofar as the City (1) claimed the hearing examiner exceeded his jurisdiction by awarding overtime compensation, and (2) requested declaratory judgment relief on this issue.[2] The court of appeals also reversed an award of attorney fees to Proler under the Declaratory Judgments Act, reasoning that this award may have been based on the trial court's conclusion that it lacked jurisdiction over the City's appeal of the hearing examiner's decision.[3] The court of appeals, with one justice dissenting, affirmed the trial court's judgment awarding injunctive relief and attorney fees to Proler on his disability discrimination claim.[4]

## B. Discussion

Proler does not challenge that portion of the court of appeals' judgment (1) reversing the trial court's order dismissing the City's claim to the extent the City claimed the hearing examiner exceeded his jurisdiction by awarding overtime compensation, and (2) reversing the trial court's award of attorney fees to Proler related to the City's declaratory judgment action. Accordingly, these portions of the court of appeals' judgment remain in effect.[5]

---

[2] 373 S.W.3d 748, 771.

[3] *Id.* at 767–68.

[4] *Id.* at 771.

[5] As Proler did not raise these issues in his response to the petition or in his response brief, they are waived. *See* TEX. R. APP. P. 53.3; TEX. R. APP. P. 55.3.

This leaves Proler's claims for disability discrimination. Proler sued under the federal Americans with Disabilities Act (ADA)[6] and under chapter 21 of the Texas Labor Code. In construing Texas law on this subject, we consider federal civil rights law as well as our own caselaw.[7]

At the outset, we note that the law prohibiting disability discrimination does not protect every person who desires employment but lacks the skills required to adequately perform the particular job. Lacking the required mental, physical, or experiential skill set is not necessarily a disability. Were the law otherwise, any person who, for instance, wishes to be a ballerina or professional basketball player could routinely sue for disability discrimination if the Bolshoi or the San Antonio Spurs declined employment. Under federal law, the applicant must be a "qualified individual,"[8] meaning an individual who "can perform the essential functions of the employment position."[9] Texas law similarly extends to "a physical or mental condition that does not impair an individual's ability to reasonably perform a job."[10] While we might question whether Proler could

---

[6] State and federal courts have concurrent jurisdiction over ADA claims. *See Zatarain v. WDSU-Television, Inc.*, No. 95–30604, 1996 WL 97105, at *1–2 (5th Cir. Feb. 7, 1996) (per curiam).

[7] *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 & n.25 (Tex. 2010); *see also* TEX. LAB. CODE § 21.001(3) (stating that purposes of Labor Code chapter 21 include "provid[ing] for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments").

[8] 42 U.S.C. § 12112(a).

[9] *See id.* § 12111(8) ("The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.").

[10] TEX. LAB. CODE § 21.105.

4

reasonably perform the firefighter job, we do not pursue this inquiry because the City does not make this argument here, and the jury was not asked to decide this question.

But the City does argue that Proler did not suffer from a "disability" and that he was not reassigned on account of a disability. We agree with the City that no evidence supports the jury findings on these issues. In reviewing the legal sufficiency of the evidence, the test "must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."[11] A challenge to legal sufficiency will be sustained if the evidence offered to establish a vital fact does not exceed a scintilla.[12] Evidence does not exceed a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion"[13] or "so slight as to make any inference a guess."[14]

Generally, state and federal law prohibit adverse personnel actions by an employer on account of an employee's disability.[15] The jury was asked whether disability was a motivating factor in the City's decision to reassign Proler to the training academy after the March 2006 incident. The jury answered affirmatively. "Disability" was defined in the charge as "being regarded as having a mental or physical impairment that substantially limits at least one major life activity." This

---

[11] *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

[12] *Id.* at 810.

[13] *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

[14] *Id.*

[15] TEX. LAB. CODE § 21.051; 42 U.S.C. § 12112(a).

definition is consistent with federal and state law.[16] "Major life activity" was defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, thinking or working." This definition tracks state and federal law.[17]

There is no evidence from which a reasonable and fair-minded jury could conclude that Proler was disabled. The jury heard evidence of two incidents where Proler was allegedly unable to provide useful help to his firefighting team during actual fires at two residential buildings. Being unable to set aside the normal fear of entering a burning building is not a mental impairment that substantially limits a major life activity. In determining disability, the issue is whether Proler was "unable to perform the variety of tasks central to most people's daily lives," not whether he was "unable to perform the tasks associated with [his] specific job."[18] Or as we have stated, the issue

---

[16] *See* TEX. LAB. CODE § 21.002(6) (defining "disability" as "a mental or physical impairment that substantially limits at least one major life activity" or "being regarded as having such an impairment"); 42 U.S.C. § 12102(2) (same).

[17] *See* 29 C.F.R. § 1630.2(i)(1)(i) (2012) (EEOC regulation defining "major life activity" to include "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working"); *see also Haggar Apparel Co. v. Leal*, 154 S.W.3d 98, 100 & n.9 (Tex. 2004) (citing section 1630.2 and noting that "[t]he definition of 'disability' in chapter 21 [of the Texas Labor Code] . . . is essentially the same as in the ADA.").

Effective January 1, 2009, Congress amended the ADA. *See* Pub. Law. No. 110-325, 122 Stat. 3353 (2008); *see also Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (noting that the ADA Amendments Act of 2008 applies to conduct occurring after January 1, 2009). In 2009, the Texas Legislature added new provisions to the Labor Code that corresponded to the federal amendments. Section 21.001(12-a) was added to provide: "'Regarded as having such an impairment' means subjected to an action prohibited . . . because of an actual or perceived physical or mental impairment, other than an impairment that is minor and is expected to last or actually lasts less than six months, regardless of whether the impairment limits or is perceived to limit a major life activity." Act of May 27, 2009, 81st Leg., R.S., ch. 337, §1, 2009 Tex. Gen. Laws 868, 869 ("Act"). Section 21.021(a)(2) was added to provide that the term "disability" "includes an impairment that is episodic or in remission that substantially limits a major life activity when active." Act § 2. These amendments apply to personnel actions occurring after September 1, 2009, and hence do not apply to today's case. *See* Act §§ 6–7.

[18] *Toyota Motor v. Williams*, 534 U.S. 184, 200–01 (2002); *see also Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 493 (1999) (holding that inability to perform a single, particular job does not substantially limit the major life activity of working).

6

is not whether the plaintiff can perform his particular job, but whether his impairment "severely limit[s] him in performing work-related functions in general."[19] Again, if one considers the NBA, the capacity to play professional basketball is an ability; the rest of us do not suffer from a disability because we cannot play at that level. A job skill required for a specific job is not a disability if most people lack that skill.[20] The jury was in fact instructed, we think correctly, that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."

Proler does not argue that he in fact suffered from a disability, but argues instead that he was perceived as suffering from a disability. The charge, consistent with federal and state law, defined a disability to include "being regarded" as having a disability.[21] But there is no evidence from which a reasonable and fair-minded jury could find that the City perceived Proler to be suffering from a mental impairment that substantially limited a major life activity. The evidence was entirely to the contrary—indicating Proler was removed from a front-line firefighting position only because City decision-makers had received information that Proler had frozen at two fires, and he was therefore perceived to be unable to do his particular job as captain of a firefighting crew. Even Proler's mother agreed that the department acted properly in removing him from the scene of the second fire.

---

[19] *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 318 (Tex. 1987); *see also Williams*, 534 U.S. at 200 ("[E]ven assuming that working is a major life activity, a claimant would be required to show an inability to work in a 'broad range of jobs,' rather than a specific job.").

[20] *See Carter v. Ridge*, 255 F. App'x 826, 830 (5th Cir. 2007) (holding that plaintiff alleging sleeping disability must show "his affliction is worse than that suffered by a large portion of the nation's adult population") (citation omitted); 29 C.F.R. §1630.2(j)(1)(ii) (2012) ("An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.").

[21] *See supra* note 15.

Fighting fires is not a major life activity; it is a job requiring highly specialized skills, unique training, and a special disposition. A district captain testified without contradiction that firefighting is one of the world's most dangerous jobs, that firefighters must perform in "IDLH" conditions—immediately dangerous to life and health—and that Houston firefighters had died in the line of duty "quite a lot in the last ten years." He explained that all firefighters must learn to overcome an instinctive disinclination to go into a fire, stating that "everything . . . in your person is screaming: Get out, get out, get out, go the other way." A reluctance to charge into a burning building is not a mental impairment at all; it is the normal human response. Such a reluctance cannot be characterized as an "impairment," much less an impairment that substantially limits a major life activity, if it does not limit "the ability of an individual to perform . . . as compared to most people in the general population."[22]

Proler testified that he suffered from depression for years. He testified he had been treated for depression before he started working for the fire department and may need treatment for the rest of his life. But there is no evidence that the City perceived Proler to suffer from an impairment that substantially limited his ability to perform a major life activity such as thinking or performing work-related functions in general. On this record, to find otherwise does not rise above the level of mere surmise or suspicion. In fact, the City reassigned him to another job that required him to think and

---

[22] 29 C.F.R. §1630.2(j)(1)(ii) (2012); *see also Greenberg v. New York*, 919 F. Supp. 637, 643 (E.D.N.Y. 1996) (holding that inability of corrections officer applicant to make decisions in emergency situations or perform effectively under stress are personality traits, not mental impairments under ADA).

work.[23] He testified that while he was employed at the academy he conducted research on firefighter injuries and worked with recruits as a safety officer. Hector Trevino, the assistant chief who reassigned Proler, understood that Proler would do administrative and training work at the academy. Proler testified that he was "able to work" in this reassigned position and received his regular paycheck as a captain. The fire department also offered Proler a captain position in communications, but he turned it down because he only wanted to work in fire suppression. A treating physician, Dr. Raichman, described Proler as taking several medications but "able to function well at work." Raichman described Proler's condition as a "mood disorder" not otherwise specified, that did not rise to the level of major depression or bipolar disorder. Raichman's psychiatric report describes Proler as "cognitively intact" and as having "no thought disorder." Proler's father, a physician, testified that Proler had suffered from depression for years but had always been able to work. The record is devoid of evidence that the City viewed Proler as unable to think, perform work-related functions generally, or perform some other major life activity.

Even assuming that Proler's depression or other medical disorder interfered with a major life activity, the record yields no evidence that he was reassigned because of this condition and hence was discriminated against on account of a disability. There is no evidence that the City was aware of Proler's treatment by Dr. Raichman or other physicians for depression. Trevino, the official who reassigned Proler, testified that he had no knowledge of Proler's history of depression until trial preparation years after the reassignments. The record is clear that Proler was reassigned twice to

---

[23] *See Thomann v. Lakes Reg'l MHMR Ctr.*, 162 S.W.3d 788, 799 (Tex. App.—Dallas 2005, no pet.) ("The fact that Lakes Regional offered Thomann a different job shows that Lakes Regional believed she was qualified for other positions and that Lakes Regional did not regard her as disabled.").

the training academy because (1) he allegedly failed to perform his firefighting duties during a fire in 2004, and (2) he indisputably failed to perform his duties during a fire in 2006. The record is devoid of evidence that the City made those reassignments because it perceived Proler to be suffering from a psychological impairment rendering him unable to perform a major life activity.

Instead, the record shows that Proler was reassigned because the City perceived him as unable to perform his specific job as a captain of a firefighting crew. As to the reassignment in 2004, Proler was asked "how did that come about," and answered that the reassignment occurred in response to a specific allegation by another employee "that I didn't go inside an apartment fire with the rest of the crew." As to the March 2006 reassignment, Proler conceded that he had been unable to perform his duties at a house fire and that Trevino had reassigned him because of this specific incident. Trevino had received reports that Proler was not "aware of his surroundings or the environment," that "[e]ither he was scared or there was an acute medical emergency that consumed him," and that "[i]f Captain Proler has some type of medical or psychiatric condition that precludes his safe behavior at a fire, then he should be removed from emergency response." A district chief had received several reports that Proler seemed to be afraid to enter the fire situation. Proler's own mother testified that his behavior at the second fire presented "a real danger" to her son "and to anybody else that would be in that situation." He was reassigned three days after the March 2006 house fire. Trevino testified without contradiction that he reassigned Proler because of the reports regarding his performance at that fire. Based on these reports—indicating Proler was unable to buckle up his own gear, respond to simple orders, or lead his firefighters—Trevino concluded that Proler should be reassigned because Proler had created an "extremely dangerous situation" for

10

himself and other firefighters. The decision was also based in part on Trevino's recollection of the 2004 reassignment resulting from information indicating that Proler "was scared to go in fires." Trevino had received two reports in 2004 that Proler "wasn't going into fires. . . . My perception was that he was scared to go into the fire scenes." Other than occasions when Proler was faced with the immediate task of entering a burning building, there was no evidence that Trevino or other City officials knew of occasions when Proler's ability to function was compromised. At oral argument, counsel for Proler confirmed that there was no "evidence in the record that Mr. Proler experienced similar mental difficulties in other everyday areas of his life." On this record a reasonable and fair-minded jury could only conclude that the City reassigned Proler because it questioned his ability to perform his particular job fighting fires and supervising his crew in those harrowing conditions, which are not major life activities. There is no evidence that the City reassigned him because it perceived him as unable to perform a major life activity such as walking, thinking, or working in general, due to an underlying mental or physical disorder.

## C. Conclusion

The court of appeals' judgment remains in effect insofar as it (1) reversed the trial court order dismissing the City's claim to the extent the City claimed the hearing examiner exceeded his jurisdiction by awarding overtime compensation and requested declaratory relief relative to this claim, and (2) reversed the trial court's award of attorney fees to Proler related to the City's declaratory judgment action. We remand the case to the trial court for further proceedings on the City's claim. We reverse the court of appeals' judgment insofar as it affirmed the trial court's

11

judgment granting injunctive relief and attorney fees on Proler's disability discrimination claims, and render a take-nothing judgment on those claims.

 

 

_____

Don R. Willett
Justice

**OPINION DELIVERED:** June 6, 2014